LUTH

v.

PALMER SHIPPING CORP.

No. 11117.

United States Court of Appeals,
Third Circuit.

Argued Nov. 17, 1953.

Decided Feb. 12, 1954.

---

Harrison G. Kildare, Philadelphia, Pa. (Rawle & Henderson, Thomas F. Mount, Joseph W. Henderson, Philadelphia, Pa., on the brief), for appellant.

Paul M. Goldstein, Philadelphia, Pa., for appellee.

Before GOODRICH, McLAUGHLIN and KALODNER, Circuit Judges.

KALODNER, Circuit Judge.

This is an appeal from a decree in an admiralty action awarding a seaman maintenance and cure.[1]

The facts as found by the District Court may be stated as follows:

Between May 2 and August 2, 1951, the libellant, William C. Luth, was employed as a boatswain on the Steamship "Nathaniel B. Palmer", owned and operated by the respondent, Palmer Shipping Corporation. In the latter part of July, 1951, while the vessel was outside Buenos Aires, Argentina, libellant became disabled because of acute stomach pains. He was treated by a physician in Buenos Aires. On August 2d, libellant's pains became so severe that he was removed to the British Hospital in Buenos Aires. The diagnosis was duodenal ulcers. Two operations were performed to relieve gastric ulcers and resect a part of the stomach, resulting in a scar across his abdomen. About this time libellant's bottom teeth were extracted. He remained at the British Hospital from August 2d until October 11, 1951, at which time he was repatriated at respondent's expense to Philadelphia, arriving there October 17, 1951. At the time of the repatriation there was due the libellant the sum of $304.85 in unearned wages, which respondent refused to pay.

On October 31, 1951, libellant reported to the United States Public Health Service at Philadelphia for treatment of his incision, which had not yet healed. While receiving treatment for his incision, he complained of stomach pains and nausea after eating. On November 29, 1951, he was given a diet schedule and was advised that due to the reduced size of his stomach pouch he should eat smaller and more frequent meals each day. He was under treatment until December 21, 1951, when he asked the Public Health Service for a fit-for-duty

---

1. The decree also made an award for "unearned wages". That award is not involved in this appeal since the unearned wages were paid in accordance with the decree.

slip, so that he could secure employment. In compliance with his request, the Service gave him a certificate of discharge, stating that he was "fit for full duty." On the same day he joined the crew of the Steamship "Dorothy" as ship's carpenter. Two weeks after he started work on the "Dorothy" libellant first noticed a small swelling in one part of his incision. However, he continued to do his regular work. The swelling gave him no pain at that time and he did not report the condition to the Master of the vessel at any time before he left that employment on April 1, 1952, after serving for three consecutive voyages.

After he left the "Dorothy" he applied for a position as a rigger at a shipyard where he was told that he was physically unqualified for the job because he had an incisional hernia. On April 4, 1952, he returned to the Public Health Service where he was examined and advised to submit to an operation to eliminate the incisional hernia. He was also requested to obtain lower dentures to assist him in properly chewing his food, which would aid in controlling the gastritis which caused his stomach pains and nausea after eating.

Beginning April 19, 1952, libellant for various periods of time, obtained the following positions:

From April 19 to 28, 1952, he was on the "Cape Fairweather" as a standby;

From June 2 to June 6 he worked as a painter;

Starting June 9, he worked three days for Haenn Shipping, shoring up cargo; and

Starting June 15, he worked two days for the Jarka Corporation, doing similar work.

On June 20, 1952, libellant's counsel wrote a letter to respondent informing it of the fact that he had developed the hernia, that an operation was necessary and that he was without funds to maintain himself during the convalescence period. He asked that it assure him it would provide the funds for his maintenance, and if the Public Health Service did not perform the operation free of charge, he would expect the respondent to pay for it. Respondent did not reply to his letter. Respondent did not offer to pay libellant maintenance and cure if he submitted to surgery for the removal of the incisional hernia.

From the period of July 2 to September 30, 1952, libellant worked as a carpenter on the Steamship "Carolyn". Although he performed his work, he did not feel well because he was continually nauseated. Thereafter he worked intermittently as a ship watchman and longshoreman up to the date of the trial, February 2, 1953.

During the period between October 17, 1951 and February 3, 1953 (the date of trial) libellant was unable to work as boatswain because of the condition resulting from the operations. He accepted lighter work, but his condition prevented him from working steadily at those jobs.

On the facts as stated the District Court held that the "fit-for-duty" certificate given libellant by the Public Health Service on December 21, 1951 was "premature"; libellant's disability was sustained in the service of the vessel and not by reason of his own vice or misconduct; from October 17, 1951, to February 3, 1953 libellant was disabled for periods aggregating 225 days because of the condition resulting from his operation and during that period improvement of his condition through nursing care and medical attention could reasonably have been anticipated.

The District Court further found that "Although libellant has made repeated requests upon it for maintenance and cure, including the period of convalescence which would follow the operation, respondent has neither paid him any part of the sum requested nor consented to do so" and "Libellant's refusal to submit to surgery until respondent would agree to pay for his maintenance and cure during the post-operative period was reasonable."

On this appeal respondent contends that libellant's rejection, "without good reason or excuse" of the Public Health Service's proffered operation for his incisional hernia in April, 1952, barred libellant from right of recovery of maintenance and cure; libellant had no legal right to impose upon the respondent a demand for guarantee of maintenance as a condition of his accepting medical care (surgery); the District Court's finding that libellant was "reasonable" in refusing the hernia operation was unsupported by the evidence; and finally, libellant's condition had reached the point of maximum improvement through medical care in December, 1951. On this score it may be noted that following the District Court's decree and prior to argument on this appeal, respondent paid that portion of the award for maintenance embracing the period from October 17, 1951 (when libellant was repatriated to Philadelphia) to December 21, 1951 (when he first returned to work).

It is libellant's contention that he did not voluntarily reject surgery but that there was an inability on his part to accept it because he would have been financially unable to maintain himself during the four months of convalescence which would follow it. He points out that although he was unable to work by reason of his illness between October 17, 1951 and December 21, 1951, respondent then refused to pay him any maintenance[2] and also refused to pay him unearned wages unquestionably due.[3] In view of respondent's past course of conduct, says the libellant, he had reasonable cause to believe that respondent would fail to pay him maintenance during the period of convalescence which would follow the surgery which was offered by the Public Health Service. On that score the record discloses that following his repatriation on October 17 libellant was confined to bed for some 10–12 days; that he then reported to the Public Health Service and received a special diet prescribing meals seven times a day; that during the period between October 17 and December 21, 1951, he was virtually destitute; that his only source of income was his wife's earnings of some $30.00 a week.[4]

The contentions of the parties present these issues: was the District Court "clearly erroneous" in its Findings of Fact that (1) there had not been a voluntary rejection of medical care by the libellant and his refusal to submit to surgery under the circumstances was "reasonable"[5] and (2) libellant's condition would have improved by medical care during the period for which he was granted maintenance and cure—October 17, 1951 to February 3, 1953,[6] and in its Conclusions of Law that the respondent was liable to libellant for maintenance.[7]

■■ As we have frequently noted, an appeal in admiralty partakes of a trial

2. Immediately after his repatriation libellant requested maintenance from respondent's local agent and officers of his union also made request for his maintenance. Libellant also wrote respondent several letters asking maintenance.

3. The "unearned wages" were due under libellant's shipping articles for the period between August 2, 1951 and August 31, 1951.

4. Libellant's wife's earnings also went to the support of their son.

5. Paragraph 24, Findings of Fact: "Libellant's refusal to submit to surgery until respondent would agree to pay for his maintenance and cure during the post-operative period was reasonable."

6. Paragraph 22, Findings of Fact: "From October 17, 1951 to trial, libellant has been disabled for periods aggregating 225 days because of the conditions resulting from the operations. During this period improvement of his condition from nursing care and medical attention could reasonably have been anticipated."

7. Paragraph 3, Conclusions of Law: "Libellant is entitled to maintenance at the rate of $6.00 per day for the first 59 days of his disability or the sum of $354.-00; and at the date of $8.00 per day for the remaining 166 days, or the sum of $1,328.00, making a total of $1,682.00."

**228**

de novo and serves to vacate the decree of the District Court; the findings of the latter when supported by competent evidence are entitled to great weight and should not, therefore, be set aside on appeal except upon a showing that they are clearly wrong.[8]

In our opinion the record establishes that the District Court's fact findings were supported by the testimony and, further, that it did not err as a matter of law in its award of maintenance to the libellant.

■ It is true, as contended by respondent, that "seaman's right to maintenance and cure is forfeited by voluntary rejection of hospital care".[9] But as we pointed out in Murphy v. American Barge Line Co., 3 Cir., 1948, 169 F.2d 61, 64, certiorari denied 1948, 335 U.S. 859, 69 S.Ct. 133, 93 L.Ed. 406, the rule is not inexorably applied; other factors present must be taken into account and given effect.[10] Thus, in the Murphy case we held that it was the shipowner's duty to furnish a seaman transportation to a distant hospital and that since it did not do so the seaman's failure to avail himself of hospitalization did not amount to a refusal of treatment precluding his recovery for maintenance and cure.

■ So, here the District Court properly determined that the libellant's failure to avail himself of surgical treatment in the absence of assurance from the respondent that it would pay him during his convalescence the maintenance to which he was clearly entitled by law, did not amount to a refusal of treatment. The District Court's determination is supported by these facts: respondent had inexcusably failed to discharge its obligation to pay the libellant maintenance from October 17, 1951, to December 21, 1951, despite his repeated demands; respondent had similarly failed to pay libellant his "unearned wages"; as a result of respondent's arbitrary refusal to discharge its obligation to pay maintenance and "unearned wages" libellant was prematurely compelled to return to work on December 21, 1951, while he was still ill; libellant had no financial resources other than his earnings, and finally, he would have been unable to work for several months during convalescence from the required surgery. It must be noted, parenthetically, that respondent did not even attempt, at the trial or on this appeal, to justify its refusal to pay libellant the maintenance due him from October 17, 1951 to December 21, 1951 and his "unearned wages" then overdue.

In contending that libellant's failure to accept surgical treatment in April, 1952, and again in October, 1952, was "without good reason or excuse" the respondent asserts that at both times the libellant had on hand wages for completed voyages and accordingly was financially able to maintain himself during post-surgery convalescence. The District Court did not subscribe to this contention, nor do we. In making it respondent overlooks the facts that when libellant was paid off in April, 1952, he had been at sea for approximately three and a third months; when he was paid off in October, 1952, he had been at sea for three months; that he had a wife and a son and he maintained a home for them and when he returned from sea he had to discharge obligations incurred for the shelter and maintenance of his family during his absence.

■ Respondent has focused its attention on the reasonableness of libellant's

8. Bentley v. Albatross Steamship Company, 3 Cir., 1953, 203 F.2d 270, 271; Read v. United States, 3 Cir., 1953, 201 F.2d 758; Crist v. United States War Shipping Administration, 3 Cir., 1947, 163 F.2d 145, 146, certiorari denied 332 U.S. 852, 68 S.Ct. 352, 92 L.Ed. 422.

9. Murphy v. American Barge Line Co., 3 Cir., 1948, 169 F.2d 61, certiorari denied 1948, 335 U.S. 859, 69 S.Ct. 133, 93 L.Ed. 406; United States v. Johnson, 9 Cir., 1947, 160 F.2d 789; The Balsa, 3 Cir., 1926, 10 F.2d 408.

10. Sims v. United States of America War Shipping Administration, 3 Cir., 1951, 186 F.2d 972, 974, certiorari denied 1951, 342 U.S. 816, 72 S.Ct. 31, 96 L.Ed. 617.

conduct but has failed to appraise the impact of its own conduct towards libellant during the period when he was compelled to arrive at a decision as to whether he would and could submit to surgery. Respondent disregards the fact that when it failed to pay to libellant the maintenance and "unearned wages" due him at the time, it submitted him to an economic pressure of the kind which we criticized in German v. Carnegie-Illinois Steel Corporation, 3 Cir., 1948, 169 F.2d 715, 719. The libellant had suffered as a result of this economic pressure and he was justified in being concerned as to how he would maintain himself during the post-surgery convalescence and in refusing to submit to surgery without assurance from respondent that it would discharge its duty to pay him maintenance. The District Court's determination, and our own, that the respondent must fail in its contention with respect to the reasonableness of libellant's conduct is in accord with the instruction we have been given by the Supreme Court of the United States that in applying the maintenance and cure rule, seamen, as wards of the courts of admiralty, should be the beneficiaries of a liberal attitude in consonance "with the dictates of sound maritime policy." [11]

It is unnecessary to discuss in detail the respondent's contention that libellant's condition reached a point of maximum improvement through medical care on December 21, 1951, and that, accordingly, the District Court erred in allowing him maintenance to February 3, 1953, the date of trial. The record discloses that libellant suffered throughout the period in question residual gastritis, which could have been improved by proper medical treatment and adherence to a rigid diet.[12] The testimony is also undisputed that surgery would have benefited

the incisional hernia condition and that there was a direct relationship between the hernia and libellant's two operations in Buenos Aires in August, 1951.[13] On the score of libellant's condition of health it need only be pointed out that as a result of his first two operations he lost 80 pounds—going down from 180 pounds to 100 pounds. He weighed 131 pounds at the time of trial.

It is crystal clear that on the facts stated the District Court did not err in making its award of maintenance to the date of trial. Brett v. J. M. Carras, Inc., 3 Cir., 1953, 203 F.2d 451; cf. Lipscomb v. Groves, 3 Cir., 1951, 187 F.2d 40.

For the reasons stated the Decree of the District Court will be affirmed.

11. Aguilar v. Standard Oil Co. of New Jersey, 1943, 318 U.S. 724, 732, Note 15, 63 S.Ct. 930, 935, 87 L.Ed. 1107; cf. Bentley v. Albatross Steamship Company, supra, Note 8.

12. Dr. John Willard, respondent's physician, testified that he examined libellant

in June, 1952, (six months after he received his fit-for-duty slip) and he then found libellant was suffering from an aftermath of the operation, "a residual gastritis."

13. Testimony of Dr. Harry A. Salzmann.